**M.B., formerly M.B., Appellant,**

v.

**D.W.; B.W.; and M.B., a
minor, Appellees.**

No. 2006–CA–002285–ME.

Court of Appeals of Kentucky.

Sept. 21, 2007.

Teresa E. Logsdon, Elizabethtown, KY, for appellant.

C. Wesley Durham, Radcliff, KY, for appellees.

Before ACREE, HOWARD, and LAMBERT, Judges.

## OPINION

HOWARD, Judge.

This appeal is from a judgment of the Hardin Circuit Court granting the petition for adoption of the minor appellee, M.B., by her stepfather, D.W., without the consent of her biological father, the appellant, M.B. (hereinafter the appellant). The appellant has undergone gender reassignment surgery and now lives as a woman. On appeal the appellant contends that clear and convincing evidence did not demonstrate grounds for the termination of parental rights. The appellant also contests the award of expert witness fees to the appellees. Finding no error, we affirm.

The appellant and the appellee, B.W., were married in June 1974 and three children were born of the marriage. The appellant and B.W. separated in 1997 and their marriage was dissolved by the Jefferson Family Court in 1998. In their settlement agreement, they agreed to joint custody of the two children who were not emancipated. B.W. was to provide the children's primary residence and the appellant received liberal visitation. The appellant was to pay $600 monthly for child support until certain specified real estate was sold. The agreement stated that the appellant's responsibility for "child support shall cease in lieu of the mortgage on the marital residence being paid off with proceeds from the sale of the acreage." The appellant was to provide health insurance for the two minor children until B.W. was eligible for insurance, at which time the appellant was to reimburse B.W. monthly for the insurance. Responsibility for uninsured medical expenses was to be divided equally between the appellant and B.W.

The appellees have not alleged that the appellant failed to satisfy any of the child support obligations. However, the record reflects that the appellant did fail to reimburse B.W. for any health insurance premiums or to pay his half of the medical expenses which were not covered by insurance, as will be discussed below.

During the marriage the appellant cross-dressed with B.W.'s knowledge, but described this as merely a "fetish" and concealed the behavior from the children. After the divorce the appellant moved to Florida and ultimately began a medical gender reassignment procedure. The children visited with the appellant during the holidays in December 1998 and January 1999, and they noticed at that time that the appellant exhibited various feminine features. The appellant testified that all three of the children called after this visitation and said that they did not want to see the appellant again. M.B., who was nine years old at the time, did not see the appellant again until she testified in the

present proceeding, at age fifteen.[1] The appellant underwent gender reassignment surgery in December of 1999.

In 2001 the appellant filed a motion in the Jefferson Family Court to enforce visitation rights with M.B., the only child not by then emancipated. However, M.B. still did not want to see the appellant, and was by this time in psychological counseling. In October 2001, the Jefferson Family Court entered an order restricting the appellant's contact with M.B. unless approved by M.B.'s guardian ad litem. By order entered on August 7, 2002, the Jefferson Family Court directed that the appellant have no contact with M.B. pending further orders of that court.

On December 15, 2003, B.W., her husband, D.W., and M.B. jointly filed in the Hardin Circuit Court a petition for adoption, without the consent of the appellant. Following an extensive hearing, the circuit court, the Honorable W. Mitchell Nance, Special Judge, granted the petition. This appeal followed.

■ An adoption without the consent of a living biological parent is, in effect, a proceeding to terminate that parent's parental rights. *Moore v. Asente*, 110 S.W.3d 336 (Ky.2003). KRS 625.090 provides that parental rights may be involuntarily terminated only if, based on clear and convincing evidence, a circuit court finds: (1) that the child is abused or neglected as defined in KRS 600.020(1); (2) that termination is in the child's best interests; and (3) the existence of one or more of ten specific grounds set out in KRS

625.090(2). These grounds include the following:

> (c) That the parent has continuously or repeatedly inflicted or allowed to be inflicted upon the child, by other than accidental means, physical injury or emotional harm....
>
> . . . .
>
> (g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child....

We begin our analysis of this case with the proposition that parental rights are "essential" and "basic" civil rights, "far more precious ... than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (citations and internal quotation marks omitted). Parental rights cannot be terminated easily—"clear and convincing" evidence is required—and we believe the requirements of KRS 625.090 should be vigorously enforced.

However, this Court has also stated,

> The trial court has a great deal of discretion in determining whether the child fits within the abused or neglected category and whether the abuse or neglect warrants termination.... This Court's standard of review in a termination of parental rights action is confined to the

---

1. It has been pointed out to us that M.B. is now 18 and emancipated. We have been urged to hold that this matter is therefore moot. We do not believe it is moot because of the potential inheritance ramifications. However, we do note that any contact between M.B. and the appellant will now be an

entirely voluntary matter between the two of them as adults, and neither the termination of the appellant's parental rights nor the refusal of the court to terminate those rights would have any effect on whether or not they choose to reestablish or maintain an ongoing relationship.

clearly erroneous standard in CR 52.01 based upon clear and convincing evidence, and the findings of the trial court will not be disturbed unless there exists no substantial evidence in the record to support its findings. . . .

Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people (citations and internal quotation marks omitted).

*M.P.S. v. Cabinet for Human Resources,* 979 S.W.2d 114, 116–117 (Ky.App.1998).

Our standard of review is consequently narrow. In this case, substantial evidence supports the circuit court's decision and it must therefore be affirmed.

As stated above, to involuntarily terminate parental rights, the circuit court is required to find that neglect or abuse has occurred, that termination is in the child's best interests and that one or more of the requirements of KRS 625.090(2) exist with respect to the child. KRS 199.500(4), in essence, incorporates these same requirements for an adoption, granted without the consent of one or both of the biological parents.

Looking first to the grounds enumerated in KRS 625.090(2), we note that the circuit court found that four of these grounds exist in this case. However, we need not unduly lengthen this opinion by examining each one. While the court's findings relating to some of the grounds may be subject to debate, others are clearly supported by substantial evidence and therefore are not "clearly erroneous."

▮ The circuit court found that M.B. suffered emotional harm, that she "suffered an injury to her mental or psychological capacity or emotional stability as dem-

onstrated by her ability to function within a normal range of performance and behavior." *See* KRS 600.020(24). Specifically, the court found that M.B. "suffered major depression, suicidal ideation, decline in school performance, physical symptoms of stomach pain and headaches and withdrawn behavior." The trial court further found that the appellant's behavior caused this injury. The appellant's actions, as found by the court, included exhibiting "physical changes in [the appellant's] appearance" when the children visited in Florida, such as long finger nails, "wearing tight shirts and short shorts (with shaved legs and arms) and breast augmentation," without any warning to prepare M.B. or the others for those changes; sending a letter to M.B.'s sister with a photograph of the appellant as a female and traveling to Kentucky from Florida dressed as a woman and demanding visitation with M.B., knowing that M.B. did not want to see the appellant.

This finding of emotional harm is clearly supported by substantial evidence. Dr. Charles K. Embry, a psychiatrist who treated M.B. after she discovered that her biological father underwent a gender reassignment, testified that M.B. became depressed over the appellant's sex change and that M.B.'s suicide ideation, decline in school performance and associated physical symptoms were related to the emotional injury occasioned by the appellant's actions.

M.B. herself testified poignantly and persuasively concerning the emotional distress the appellant's behavior caused her. She stated that she felt "abandoned," and that the worst part was "knowing that I did not have a father, where you go to school and say, 'I don't have a father, he's a woman.'" M.B.'s brother and mother also testified at length about the detrimen-

tal effects on M.B. brought about by the appellant's actions.

We note that the circuit court did not find that the appellant's undergoing gender reassignment, by itself, inflicted M.B.'s emotional injury and justified termination of the appellant's parental rights. Rather, the court found that the entire series of events, including the appellant's behavior surrounding the sex change, caused the emotional injury. It is clear that M.B., as well as her two siblings, were not adequately prepared for the appellant's gender reassignment. Although one professional opined that the entire family mishandled informing and supporting M.B., we cannot say that the circuit court erred in holding the appellant primarily responsible for M.B.'s emotional injury. As the trial court accurately summarized the testimony,

> [The appellant] had no conversations with [B.W., the mother] to prepare the children for changes they observed during the Christmas, 1998 visit, and when [the appellant] telephoned [B.W.] in the summer of 2000, [the appellant] did not inform [B.W.] even then that [the appellant] had undergone a sex change, an omission manifesting at best an unconscionable indifference to the emotional welfare of other persons in [the appellant's] family in general and [M.B.] (then approximately eleven [11] years of age) in particular.

The circuit court's finding that the appellant continuously or repeatedly inflicted emotional harm on M.B. is supported by substantial evidence and therefore is not clearly erroneous.

■ The circuit court also found that the appellant failed to financially support M.B. The dissolution agreement between the appellant and B.W. stipulated that the appellant was financially responsible for the cost of M.B.'s health insurance and for

half of her uninsured medical expenses. It is uncontroverted that the appellant did not reimburse B.W. for these amounts, and that on only one occasion, in 1999, did the appellant even ask B.W. about the health insurance and medical expenses. We are unpersuaded, as was the circuit court, by the appellant's argument that B.W. did not inform her of the amounts. The appellant knew that B.W. incurred expenses relating to M.B.'s medical needs, but did not inquire or tender money to B.W. for reimbursement of those amounts. The circuit court's finding that the appellant continuously or repeatedly failed to financially support M.B., as to her medical needs, is supported by substantial evidence and is not clearly erroneous.

■ The same evidence cited above regarding emotional harm supports the circuit court's finding that M.B. was neglected. KRS 600.020(1) defines an "[a]bused or neglected child" as,

> a child whose health or welfare is harmed or threatened with harm when his parent . . .
>
> > (a) Inflicts or allows to be inflicted upon the child physical or emotional injury as defined in this section by other than accidental means. . . .

KRS 600.020(24) defines "emotional injury" as follows:

> "Emotional injury" means an injury to the mental or psychological capacity or emotional stability of a child as evidenced by a substantial and observable impairment in the child's ability to function within a normal range of performance and behavior with due regard to his age, development, culture, and environment as testified to by a qualified mental health professional[.]

As noted above, the trial court expressly found that such an emotional injury occurred, closely echoing the statutory lan-

guage. The circuit court's finding that M.B. was neglected by being inflicted with emotional injury is supported by substantial evidence and is not clearly erroneous.

■ The appellant argues that terminating the appellant's parental rights and allowing M.B. to be adopted by D.W. was not in M.B.'s best interests. The trial court found in this regard as follows:

> [The appellant] further acknowledges that her life and friends are different now from when she was [the appellant's former name], and, of even greater significance, [the appellant] acknowledges that the voluntary decision to undergo the sex change surgery was about doing what was good for [the appellant] in [the appellant's] own self-centered interest and not about what was good for, or otherwise in the best interest of, the parties' children, including [M.B.].

The appellant acknowledged knowing in advance that having a sex change would not be good for the children. Furthermore, the appellant's expert witness, Dr. Marilyn Volker, acknowledged that some children can accept transgendered parents and some cannot. She conceded that some children want their parent's parental rights terminated in this situation and that it is important for the transgendered parent to respect and honor the child's clear decision, or they will do more harm to the relationship. She felt that the ultimate decision to terminate parental rights or not should be made in the child's best interests.

M.B. testified at length and was very clear about her desire to be adopted by her stepfather. She stated that it was her decision to seek this adoption, and that, "I want to be able to have a father in my life, a legal father. I don't have that with my

biological father and I don't want it with my biological father." As to D.W., her stepfather, she stated that if the adoption was granted, "I will be able to call him my real father. I will be able to tell people, 'That's my dad, that's my real dad,' and I will feel like he's always been there." Likewise, M.B.'s mother, stepfather, brother and Dr. Embry all testified to the extent of her emotional injury occasioned by the appellant's actions and the benefits to M.B. of the adoption.[2] The circuit court's finding, that the termination of the appellant's parental rights and the granting of the adoption is in M.B.'s best interests, is clearly supported by substantial evidence and therefore is not clearly erroneous.

■ The appellant has also argued that there were other measures, less drastic than termination, which might have been effective in protecting the best interests of M.B. This court has held that a trial court should consider any such less drastic measures. *D.S. v. F.A.H.*, 684 S.W.2d 320 (Ky.App.1985). However, it does not appear from the record that the appellant ever raised this issue in the trial court. Certainly, no CR 52.02 motion was filed requesting such findings. Pursuant to CR 52.04,

> A final judgment shall not be reversed or remanded because of the failure of the trial court to make a finding of fact on an issue essential to the judgment unless such failure is brought to the attention of the trial court by a written request for a finding on that issue or by a motion pursuant to Rule 52.02.

*See also Cherry v. Cherry*, 634 S.W.2d 423 (Ky.1982).

---

**2.** We also note that the Kentucky Cabinet for Health and Family Services filed a confidential report in this case, as they are required to

do by KRS 199.510, and that report also recommended that the court approve the adoption, as being in M.B.'s best interests.

Furthermore, we believe that the circuit court did make an implied finding in its discussion of M.B.'s best interests, that no remedy less drastic than termination would be sufficient to protect those interests. In this situation, where the emotional harm to M.B. was closely related to her feeling that she was abandoned by her father and her need to have a father figure in her life, we could not say that such a finding would be unsupported by the record.

There are no reported Kentucky cases dealing with termination of parental rights in a situation involving gender reassignment. We have been cited, and have been able to find, only one such case from any other jurisdiction. In *Daly v. Daly*, 102 Nev. 66, 715 P.2d 56 (1986) *overruled on other grounds based on amendment to Nevada statute, In re Termination of Parental Rights as to N.J.*, 116 Nev. 790, 8 P.3d 126 (2000), the Nevada Supreme Court affirmed the termination of the parental rights of a biological father who had undergone gender reassignment surgery. While that opinion deals in great part with the jurisdictional requirements of the Nevada statute in place at that time, the Nevada court also affirmed the trial court's finding that the termination was in the child's best interests.

Although it did not involve termination, in *J.L.S. v. D.K.S.*, 943 S.W.2d 766 (Mo. App. E.D.1997), the Missouri Court of Appeals affirmed an order temporarily prohibiting visitation and reversed an award of joint custody, based on the best interests of the children, where the biological father had undergone gender reassignment and there was substantial evidence that such had caused emotional harm to the children.

We do not uphold the termination of any parent's parental rights without great care. Neither do we hold that a parent's undergoing gender reassignment is, in itself, grounds for such termination. Those grounds are set out in KRS 625.090. However, when the trial court has otherwise determined that the requirements of KRS 625.090 have been satisfied and that termination is in the child's best interests, we do not believe that a parent is exempt from having his rights terminated, or that his neglect or abuse of the child, leading to the termination, should be excused because that neglect or abuse occurred in the process of his obtaining a gender reassignment. We have carefully reviewed the evidence and the record in this case. The circuit court's findings, which the court expressly stated were based on clear and convincing evidence, comply with the requirements of KRS 625.090 and KRS 199.500, are supported by substantial evidence, and are not clearly erroneous.

Finally, the appellant asserts that the circuit court abused its discretion in directing that appellant be responsible for one-half of Dr. Embry's fee for appearing at the trial. The appellees requested that the appellant be responsible for Dr. Embry's total bill of $3,750 for his trial appearance. During discovery the appellant deposed Dr. Embry, but opposed the appellees' motion to utilize the deposition video in lieu of Dr. Embry's live testimony. The circuit court did not abuse its discretion in directing that the appellant pay one-half of Dr. Embry's expenses for his appearance at the trial.

The judgment of the Hardin Circuit Court is affirmed.

ALL CONCUR.