W.A., Appellant,

v.

**CABINET FOR HEALTH AND FAMILY SERVICES, COMMONWEALTH Of Kentucky; and Z.I.C., an Infant, Appellees.**

and

**J.A.A., Appellant,**

v.

**Cabinet for Health and Family Services, Commonwealth of Kentucky; And Z.I.C., an Infant., Appellees.**

Nos. 2008–CA–000241–ME, 2008–CA–000252–ME.

Court of Appeals of Kentucky.

Oct. 31, 2008.

Discretionary Review Denied by Supreme Court Feb. 11, 2009.

Josian A. Passalacqua, James Dean Liebman, Frankfort, KY, for appellants.

Jerry M. Lovitt, Georgetown, KY, for appellee.

Before CAPERTON and MOORE, Judges, and GUIDUGLI,[1] Senior Judge.

*OPINION*

MOORE, Judge.

W.A. and J.A.A. appeal from the Franklin Family Court's order and judgment terminating their parental rights. After a careful review of the record, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Patricia Adams, an employee of the Cabinet for Health and Family Services (Cabinet), testified at the termination hearing in the family court. She attested that she first became involved with J.A.A. (mother) when the mother was pregnant and in the hospital. At that time the mother tested positive for cocaine in a pre-natal drug screen. A treatment plan was set out for the mother so that she could get some treatment before the baby was born. The mother was warned that if the child was born and tested positive for drugs, then the Cabinet would have to take action. The mother acknowledged that she understood.

Ms. Adams was subsequently informed that the mother was at a hospital after being involved in a domestic violence incident with W.A. (father), and that both of them had been using cocaine. Pre-natal testing was again conducted, and the result was positive for cocaine. The baby (a son) was born a couple of days later, and the baby tested positive upon birth for cocaine.

Ms. Adams was involved with the family for less than three months. Both the mother and father signed prevention plans.

Their goals were to resolve their substance abuse problems. Domestic violence and anger management were identified as issues for the family, and the family needed to have a place to live and to meet the child's needs financially. The father had been released from the military, and he was receiving a "sufficient" amount of disability benefits for him to be able to "provide support."[2] Ms. Adams informed the parents separately about what they needed to do within a specified amount of time before the Cabinet could change its goal for the child.

Rebecca Hamrin, another Cabinet employee who handled the parents' case after Ms. Adams, also testified. Ms. Hamrin attested that the mother finished a twenty-eight day substance abuse program in Ohio. She testified that the parents repeatedly went through a cycle of: (1) using cocaine; (2) resulting in a domestic violence incident; (3) leading to an intervention by the police or by the Cabinet; (4) entering a treatment program; (5) getting everything that they think they can get from the treatment program or completing the program; (6) getting back together; and (7) repeating the cycle once they get back together. Ms. Hamrin attested that she observed the parents go through this cycle four times in the previous eighteen months.

Ms. Hamrin stated that at some point after the child's birth, the mother was convicted of possessing controlled substances, resulting in the mother's serving sixty days of imprisonment. As for the father, he was convicted of possessing a controlled substance and of fourth-degree assault/domestic violence. Furthermore,

---

**1.** Senior Judge Daniel T. Guidugli, sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

**2.** Ms. Adams did not specify the amount that the father received in disability benefits.

after the child at issue in this case was born, the mother gave birth approximately a year later to another child, a daughter, who also tested positive for cocaine upon birth.[3]

Ms. Hamrin attested that every time the parents began the cycle, they lost their housing. Consequently, they have not been able to keep any particular housing for more than three months at a time. She stated that for a period of not less than six months, either or both parents failed or were substantially incapable of providing essential care for the child at issue, and the mother was not able to financially support the child for that period of time. Ms. Hamrin testified that there was a period of ninety days or more when the parents had no contact with the child.

Ms. Hamrin acknowledged that the mother submitted to random drug tests and all of those results had been negative.[4] To Ms. Hamrin's knowledge, the last time the mother used drugs was approximately seven months before the hearing in this matter, i.e., when the mother gave birth to the daughter who tested positive for cocaine.

Ms. Hamrin attested that the mother claimed she was going to divorce the father, but the mother had said this to Ms. Hamrin four times previously. Nonetheless, the parties remained married. Ms. Hamrin did not believe that the mother pursued domestic violence treatment, which she was required to do, pursuant to the prevention plan that the mother signed when Ms. Adams was the family's case worker.

Ms. Hamrin testified that while the child at issue was in the Cabinet's care, there was one domestic violence order (DVO) entered concerning the parents. When asked how she could consider the child abandoned when the parents were in treatment programs, Ms. Hamrin responded that in March, April, and May of 2007, the parents were not in a program; rather, they were living in an apartment in Lexington. Ms. Hamrin stated that, to her knowledge, the father never paid child support. The father's attorney asked Ms. Hamrin if there was any reason, other than the father's drug history, why the father would not be reunified with the child, and Ms. Hamrin responded that she thought the father was violent and that he had the capacity to inflict harm. When asked if she ever saw the father act violently, Ms. Hamrin replied in the negative. However, when asked if her only bases for thinking that the father was violent were the mother's claims and the DVO that was in effect at that time, Ms. Hamrin stated that the child's two older siblings told her previously that the child's father hit them in the past.[5]

The mother testified that she completed a drug treatment program shortly after the child was born. At the time of the hearing, she was attending a treatment program, which she began after the DVO was entered. She testified that she was a senior at Kentucky State University, majoring in psychology with a minor in criminal justice; that she was twelve hours short of receiving her undergraduate degree; and that she was registered for the following semester and planned to complete her degree at that time. The mother

---

3. The daughter is not involved in the present case.

4. Ms. Hamrin did not specify when or over what time period those random drug tests occurred.

5. No objection was made to this testimony. We note that the child's two older siblings are his half-siblings, as they share the same mother with the child at issue in this case.

attested that, prior to her past three years of drug addiction, she was an honor student at the university. After graduating from college, she wanted to work with women, specifically with those who have substance abuse problems and co-dependency issues.

The mother testified that she worked at a restaurant, Johnny Carino's, and she was a certified chef. She attested that she had been employed there for one month. She worked twenty to twenty-four hours per week, and she expected to continue working that number of hours when school started a month later. The mother testified that the last time she used any illegal substances was in May 2007. She planned to divorce the father. The mother attested that the child should be returned to her because she was clean and sober, she had a job, and she had housing. She testified that she received marriage counseling, parenting counseling, and domestic violence counseling, in addition to the drug treatment she received. The mother attested that she completed three in-patient treatment programs through the Veterans Administration (VA) Hospital.

At the time of the hearing, the father was incarcerated due to a domestic violence incident between the mother and himself that occurred the month before the hearing. Nevertheless, he was present to testify. He testified that he suffers from post traumatic stress disorder (PTSD) due to the fact that he was shot twice in the line of duty while in the military. He stated that he initially began using drugs to keep his mind off of the bad memories he had from his time in the military, then drug use became a habit to him. He attested that at the time of the hearing, he had been drug-free for almost a year.

The father completed a PTSD treatment program earlier in the year. He also completed a drug treatment program in January 2007. The father acknowledged that there was a DVO against him at the time of the hearing, and he stated that, after he was released from jail, he planned to go to Florida for a VA treatment program before returning to Kentucky to mentor others. He stated that he would probably have to do another drug treatment program, as well as another PTSD program. The Florida programs could last for six months.

The father further testified that, at the time the child was born, the father was incarcerated for domestic violence. He attested that he never previously heard, before that day in court, that his wife (the child's mother) intended to divorce him. The father contended that during the May 2006 domestic violence incident between the mother and himself, he was having a flashback, but he had since obtained treatment for his PTSD and his medication had since been adjusted. He stated that during the November 2007 domestic violence incident, which was approximately one month before the termination hearing, he had not been using drugs, contrary to the mother's assertion.

Both parents testified that they had the child for at least one overnight visit since his birth, but they were unable to specify when that occurred.

The family court entered findings of fact and conclusions of law, in which it found that the termination of parental rights petition was filed after the child was in the Cabinet's care and in foster care for fifteen months. The child was born in May 2006, and he tested positive for cocaine at his birth. The child had "resided in foster care under the responsibility of the Cabinet since his birth."

At the time the child was born, his father was incarcerated for domestic violence. The court noted that both parents

"candidly conceded that they had a drug problem and testified of their vast and continuing efforts to eliminate that problem." The family court concluded that the parents "failed to protect and preserve [the child's] fundamental right to a safe and nurturing home; [the child] is a neglected child as defined in KRS 600.020; and it is in the best interest of the child that the [parents'] parental rights be terminated." The court stated that the child had "never been in the physical custody of his natural parents. He ha[d] spent no more than one or two nights" with the parents since his birth. The court found that the parents "both abandoned the child for a period of not less than ninety (90) days." The court determined that the parents, "for a period of not less than six months, ha[d] continuously failed or refused to provide or ha[d] been substantially incapable of providing essential parental care and protection for the child, and there [was] no reasonable expectation of improvement in parental care and protection, considering the age of the child."

The family court found that the Cabinet had

offered or provided all reasonable services to the family, but the parents ha[d] either failed or refused to make any change in their circumstances, conduct, or conditions which would allow the child to be safely returned to their care, as established by the recent domestic violence and drug use evidence presented at the trial. The Cabinet made reasonable efforts to facilitate reunification of [the child] with his parents. Rebecca Hamrin testified at the [termination of parental rights] hearing that she even transported [the child] to Lexington to visit with [the father] while he was in drug treatment.

The court concluded that the child was an abused or neglected child pursuant to KRS 600.020(1); that the criteria set forth in KRS 625.090 was met and it would be in the best interest of the child to terminate the parental rights of his parents; that for at least six months, the parents "continuously failed to provide or [had] been substantially incapable of providing essential parental care and protection for the child," and there was "no reasonable expectation of improvement in parental care and protection"; and "for reasons other than poverty alone," the parents "continuously failed to provide or [were] incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being."

The family court found that the parents "together received marriage counseling and drug counseling from the pastor at Grace Fellowship in Frankfort through at least October 31, 2007. [Their] home was disrupted in early November of 2007 when there was an alleged incident of domestic violence by [the father] against [the mother]." The court noted that the mother, in obtaining an emergency protective order against the father, "strongly implied that he was under the influence of drugs," but the father "testified and submitted drug screens that indicated he had been clean of drugs during the time and for some time prior to the incident." Further, the family court stated that the father testified at the termination of parental rights hearing "that he planned to attend an additional lengthy treatment program in Florida after he got out of jail. That further treatment ... may last six (6) more months. It would then be at least until July of 2008 before he would be in a position to have custody of [the child]."

The court determined that the parents had "abandoned the child for a period of not less than ninety (90) days." The court found that the parents had "not made suf-

ficient progress in their circumstances, conduct, and conditions to make it in the child's best interests to be returned to them."

The family court terminated the parents' rights, transferred custody of the child to the Cabinet, and gave the Cabinet "the authority to place the child up for adoption." An order consistent with these findings was entered.

The father now appeals, contending that the family court erred when it found that all the requirements set forth in KRS 625.090 were met and that there was clear and convincing evidence that there were sufficient grounds to terminate his parental rights. The mother also appeals, alleging that the family court's decision was not supported by substantial evidence, and that her parental rights should not have been terminated. Both appeals have been consolidated to the extent that they are being reviewed by the same panel.

## II. STANDARD OF REVIEW

■■■ The trial court has broad discretion in determining whether the child fits within the abused or neglected category and whether the abuse or neglect warrants termination. This Court's review in a termination of parental rights action is confined to the clearly erroneous standard in CR 52.01 based upon clear and convincing evidence, and the findings of the trial court will not be disturbed unless there exists no substantial evidence in the record to support its findings. Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people.

*R.C.R. v. Commonwealth Cabinet for Human Resources,* 988 S.W.2d 36, 38–39 (Ky.

App.1998), *as modified* (Jan. 29, 1999) (internal quotation marks and citations omitted). "In a trial without a jury, the findings of the trial court, if supported by sufficient evidence, cannot be set aside unless they are found to be clearly erroneous. This principle recognizes that the trial court had the opportunity to judge the witnesses' credibility." *Id.* at 39 (internal quotation marks and citations omitted).

## III. ANALYSIS

This Court has held that:

KRS 625.090 provides that parental rights may be involuntarily terminated only if, based on clear and convincing evidence, a circuit court finds: (1) that the child is abused or neglected as defined in KRS 600.020(1); (2) that termination is in the child's best interests; and (3) the existence of one or more of ten specific grounds set out in KRS 625.090(2).

*M.B. v. D.W.,* 236 S.W.3d 31, 34 (Ky.App. 2007).

In the present case, the family court found that the child was neglected. Pursuant to KRS 600.020(1), an

"[a]bused or neglected child" means a child whose health or welfare is harmed or threatened with harm when his parent, guardian, or other person exercising custodial control or supervision of the child:

\* \* \*

(d) Continuously or repeatedly fails or refuses to provide essential parental care and protection for the child, considering the age of the child;

\* \* \*

(g) Abandons or exploits the child;

(h) Does not provide the child with adequate care, supervision, food, clothing, shelter, and education or

medical care necessary for the child's well-being . . .; or

(i) Fails to make sufficient progress toward identified goals as set forth in the court-approved case plan to allow for the safe return of the child to the parent that results in the child remaining committed to the cabinet and remaining in foster care for fifteen (15) of the most recent twenty-two (22) months.

The family court found that the child was neglected in accordance with the aforementioned provisions of KRS 600.020(1). Specifically, the court reasoned that the child was neglected because the parents had, for at least six months, "continuously failed to provide or ha[d] been essentially incapable of providing essential parental care and protection for the child, and there [was] no reasonable expectation of improvement in parental care and protection, considering the age of the child." The court also found that the parents had abandoned the child for at least ninety days. Further, the family court determined that the parents had "continuously failed to provide or [were] incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being." Finally, the court found that the Cabinet had "offered or provided all reasonable services which were likely to permit a reunification of th[e] family."

■ As previously noted, Ms. Hamrin testified that for a period of not less than six months, either or both parents failed or were substantially incapable of providing essential care for the child at issue, and the mother was not able to financially support the child for that period of time. Ms. Hamrin also testified that there was a period of ninety days or more when the parents had no contact with the child. Furthermore, the child had been born on May 12, 2006, tested positive for cocaine at birth, and he was immediately placed in the Cabinet's care. The Cabinet retained custody of the child for fifteen months before the Cabinet filed its petition for the involuntary termination of parental rights on August 14, 2007. During that fifteen months, the parents signed prevention plans. Although they both obtained treatment for their substance abuse problems, neither of them was able to remain drug-free for the entire fifteen months, and the mother gave birth to another child who tested positive for cocaine approximately one year after the birth of the child in this case. Moreover, there were multiple domestic violence incidents between the parents, the most recent of which occurred in November 2007, approximately one month before the termination hearing in the family court. Therefore, there was substantial evidence supporting the family court's determination that the child in this case qualified as "neglected" under KRS 600.020(1).

■ Pursuant to KRS 625.090, after a court has determined that a child is neglected, the court must next determine whether termination would be in the best interest of the child, before the parents' rights are terminated. *See* KRS 625.090(1)(b); *see also M.B.*, 236 S.W.3d at 34. In the present case, the family court found that termination would be in the child's best interest. Based upon the evidence presented during the hearing, and discussed *supra*, we find that substantial evidence supports this conclusion.

In addition to the above criteria, pursuant to KRS 625.090(2), parental rights may not be terminated unless the trial court finds one of the following grounds by clear and convincing evidence:

(a) That the parent has abandoned the child for a period of not less than ninety (90) days;

* * *

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;

* * *

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child; [or]

* * *

(j) That the child has been in foster care under the responsibility of the cabinet for fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition to terminate parental rights.

As previously noted, Ms. Hamrin testified that there was a period of ninety days or more when the parents had no contact with the child. She also attested that for a period of not less than six months, either or both parents failed or were substantially incapable of providing essential care for the child at issue, and the mother was not able to financially support the child for that period of time. Furthermore, the Cabinet retained custody of the child for fifteen months continuously before the Cabinet filed its petition for the involuntary termination of parental rights. The child was in foster care during that time. Therefore, the family court properly found the existence of one or more grounds for terminating parental rights in this case, pursuant to KRS 625.090(2).

Kentucky Revised Statute 625.090(3) provides, in pertinent part, that:

In determining the best interest of the child and the existence of a ground for termination, the Circuit Court shall consider the following factors:

* * *

(c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court;

(d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child.

The family court found in the present case that the Cabinet made "reasonable efforts to facilitate reunification of [the child] with his parents," noting that Ms. Hamrin attested "that she even transported [the child] to Lexington to visit with [the father] while he was in drug treatment." Furthermore, although the mother began working before the termination hearing, she had only been working for less than a month. The mother's random drug tests for the prior seven months were negative, and she had obtained housing by the time of the hearing. But, Ms. Hamrin testified that the parents had never been able to keep their housing for more than three months due to their drug problems. The family court found that the parents' circumstances, conduct, or conditions were not sufficiently adjusted so that it was in the child's best interest to return him to his parents. The court noted that the parents were involved in a domestic vio-

lence altercation just one month before the hearing, and an EPO and a DVO were obtained by the mother against the father just days before the termination hearing. The family court stated that, at the time of the hearing, the father was in jail "awaiting adjudication of the criminal charges arising from the incident." We find that substantial evidence supports the family court's decision, and the court did not abuse its discretion in terminating the parents' rights, as the criteria set forth in KRS 625.090 were met.

We pause to note that the father contends that his time in jail should not be considered in determining whether he has "abandoned" the child. "Although incarceration for an *isolated* criminal offense may not constitute abandonment justifying termination of parental rights," *Cabinet for Human Resources v. Rogeski*, 909 S.W.2d 660, 661 (Ky.1995) (emphasis added), the father in the present case has repeatedly been in jail since the child was born. For example, he was in jail serving time for offenses involving possession of a controlled substance and fourth-degree assault/domestic violence at the time that the child was born, and he was again in jail for a separate domestic violence incident at the time of the termination hearing. Thus, the father's incarceration was a factor the family court could consider in making its decision. Nonetheless, given the cycle of drug abuse, violence and the fact that the father has spent only one or two nights with the child for the child's entire life, we cannot say the family court erred in its determination.

Accordingly, the order and judgment of the Franklin Family Court are affirmed.

ALL CONCUR.