**C.H., N/K/A C.T., Appellant**

v.

**CABINET FOR HEALTH AND FAMILY SERVICES, Commonwealth of Kentucky, Appellee.**

**Nos. 2012–CA–001268–ME, 2012–CA–001269–ME.**

Court of Appeals of Kentucky.

March 29, 2013.

Case Ordered Published by Court of Appeals May 10, 2013.

Arthur A. Abshire, Lexington, KY, for Appellant.

Jerry M. Lovitt, Esq., Assistant Counsel, Bluegrass Region, Cabinet for Health & Family Services Lexington, KY, for Appellee.

Before MOORE, NICKELL, and TAYLOR, Judges.

## OPINION

MOORE, Judge:

C.H., mother, appeals the Fayette Circuit Court's order terminating her paren-

tal rights regarding her biological children, J.A.J. and M.H. After a thorough review of the record, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The children were initially removed from mother's care and placed in foster care in November 2008 after an allegation of sexual abuse regarding J.A.J. was substantiated against her stepfather, J.H., who is the biological father of M.H.[1] J.H. pled guilty to two counts of first-degree sodomy and one count of first-degree sexual abuse and was sentenced to fifteen years' imprisonment. On June 4, 2009, mother stipulated to and the circuit court made a finding of risk of sexual abuse. There were allegations that mother had been aware of the abuse. With the exception of authorized visitation with mother, the children have resided in foster care since their removal.

The University of Kentucky Center on Trauma and Children performed a Comprehensive Assessment and Training Services (CATS) Assessment on October 14, 2009. The findings were reported on January 10, 2010. Kate Hubbard, one of the social workers who completed the assessment, later testified that based upon the assessment it was the Center's recommendation that the children not be returned to the care of mother.

Ms. Hubbard indicated that mother did not have a full understanding of what had happened to J.A.J., her contribution to J.A.J.'s maltreatment, or how she had failed to protect J.A.J.;[2] she had no ade-

---

1. The record also reflects that the children were previously removed from the care of mother and J.H. by the State of Louisiana prior to J.H. and mother moving with the children to Kentucky. The reason for removal at that time involved alleged abuse by J.H. of one-week-old M.H. which resulted in M.H. exhibiting shaken baby syndrome. J.A.J. also

reportedly disclosed being sexually abused by J.H. during that period of removal. However, the children were returned to the home "due to the petition not being timely filed."

2. It is unclear as to whether mother was fully apprised of the details regarding the abuse at the time of the assessment.

quate plan to protect the children and was "unlikely to be a protective caregiver"; she had ongoing and problematic contact with J.H., who had sexually abused J.A.J.; and she was "experiencing a myriad of psychological symptoms," including paranoia, dissociation, impairment in self-reference, anxiety, and obsessive compulsive thoughts. She reported that these issues would take a considerable amount of time to resolve.

The Cabinet nevertheless rejected the CATS recommendation and began reunification efforts. Mother completed her case plan, which included a parenting assessment and twelve classes at the Center for Women, Children, and Families. She also participated in individual counseling sessions, completed a psychological assessment, and began taking medication to manage her clinically diagnosed post-traumatic stress and mild recurrent major depression. She began receiving disability benefits. She and J.A.J. also participated in counseling together.

In an effort to transition the children back into the home, the Cabinet began to permit mother to have unsupervised weekend visitation with the children. On April 23, 2011, during the second weekend visitation, mother "spanked" J.A.J., which resulted in extensive bruising on her arm and extending from J.A.J.'s lower buttock to her lower thigh. J.A.J. reported that she believed she was being punished because her mother felt she was being disrespectful and because she threw her clothes on the bed accidentally hitting the string hanging from the light causing the fan string to swing up and hit the fan. Mother pled guilty to criminal abuse in the third degree on August 3, 2011.[3]

On August 31, 2011, the Cabinet changed the children's permanency plan to adoption. The circuit court signed an order relieving the Cabinet of any further reasonable efforts for reunification.

The Cabinet filed a petition for termination of parental rights. A hearing was held on February 14, 2012, and continued on March 16, 2012. Several witnesses testified regarding mother's parental fitness, including Kate Hubbard, whose testimony is summarized above.

Cabinet worker Vanessa Dennis testified that mother was aware that she was under the supervision of the Cabinet at the time of the "spanking" incident but had shown no remorse for her actions. She also testified that, despite mother's assertions, there was no evidence that J.A.J. bruised more easily than any other child. Ms. Dennis stated that the Cabinet had spent considerable time and effort in an attempt to reunify the children with mother and that both children had expressed that they preferred to stay in their current foster home. She further indicated that, although mother had been making payments of $100 per month toward her child support obligation, she had a felony arrearage in the amount of $1,206.

Lindsey Brady from CASA[4] also testified that it was CASA's position that the "girls will not be safe if returned home" and that this conclusion was based in part upon J.A.J.'s comments to the CASA worker that she did not feel safe going back home.

The children's foster parents, the Howards, testified that they believed it was in the children's best interest for them to be returned to their mother. At the time of the hearing, the children had resided with the Howards for approximately three

3. Mother was sentenced to two years' probation.

4. Court Appointed Special Advocate.

years. During that period, the Howards indicated that they had developed a close relationship with both the children and mother. Mrs. Howard indicated that it was always their goal as foster parents to see the foster children reunited with the biological parents. She described J.A.J. as having been "an adult for so long that she hasn't been a child like she should be." She described M.H. as never having been able to have a life with her mother because she was removed from the home at such a young age. She expressed that M.H. had always wished to return to her mother; whereas, J.A.J. says it does not matter one way or the other, "she wants to go and then she don't want to go." Ms. Howard acknowledged that the discrepancy regarding the children's expression of their wishes depending on who they were talking to could be an attempt by the children to tell others what they wanted to hear. She also indicated that the children were now aware that the Howard's no longer planned to adopt them, which appears to have been the permanency plan for the children until just a few weeks prior to the hearing.

When questioned about the "spanking," Ms. Howard said she had fostered one hundred and ninety-eight children in their home and that J.A.J. did not bruise any more easily than "any other normal child." She indicated that she was "surprised that [J.A.J.] had been hit like that," but believed that it would not happen again because of the counseling that mother had undergone. Both foster parents did not believe that mother would make that "mistake" again.

J.H., father of M.H., also testified that he felt it was in the child's best interest to be returned to her mother. His testimony revealed that he was unaware of the extent of the bruising that resulted from J.A.J.'s "spanking" or the resulting criminal charge. He stated that, although he was unaware of the details of this incident, it did not change his mind. J.A.J.'s father was properly notified of the termination proceedings but did not participate.[5]

Despite mother having stipulated to placing the children at risk of sexual abuse, mother maintained that she was unaware that any abuse had occurred until J.A.J. was twelve years old. She admitted that J.A.J. had told her she was being abused when she was four or five years old but that J.A.J. had ultimately recanted. Mother testified that after that point she "paid attention to what was going on." However, she explained that the abuse must have occurred while she was taking medication which caused her to sleep. Mother says she has since changed her medication and that it still causes her to sleep "but not to that degree." Mother continues to take Lortab, muscle relaxers, Klonopin (to aid her in resting), and spinal injections every six weeks.

Mother testified that the counseling services had been very helpful for her relationship with J.A.J., but that these services were terminated once the Cabinet was relieved of continuing reasonable efforts.[6]

5. Both fathers' parental rights were terminated in this proceeding. Neither appeal the circuit court's decision.

6. Counsel for mother represented at the March 16 hearing that mother had continued counseling with J.A.J. after the Cabinet terminated these services. He indicated that during that time J.A.J. completed a crucial "trauma narrative" with mother and had made significant progress. A report was filed with the court indicating that J.A.J.'s trauma narrative was completed after the date that services were terminated. Mother however apparently did not recall that these services were continued, as her testimony reflected that counseling services did not continue after the Cabinet was relieved of its duty to provide reasonable services.

She indicated that M.H. had always wanted to return to mother's home but that J.A.J.'s desire to return mother's home or to stay in foster care varied. She asserted that the children had no reason to be afraid of her.

Regarding the "spanking" incident, mother maintained that she struck J.A.J. only three times with a belt and that J.A.J. simply bruised easily. She explained that she only resorted to using a belt because the children had hidden the paint stick she normally used. When asked whether or not she pled guilty to criminal abuse of J.A.J. she replied "I guess that would be a yes." She explained that she only "[took] the deal" to "give the Cabinet ... and everyone involved in this case the opportunity to let me be monitored with my children...."

> Mother: That was my reason for not fighting [the charges], because I felt it would give everyone a comfort level to return my kids home to me.
>
> . . . .
>
> Counsel for Cabinet: Are you denying that you abused [J.A.J.]?
>
> Mother: I'm not denying that I spanked [J.A.J.].... There was no indication in [the case plan] that I should not be able to discipline my children.... I'm not saying that I didn't overdo it. What I'm saying is that, as we referred to earlier which I am not trying to make any excuses for anything, is that [J.A.J.] bruises easily and that she was squirming when I was spanking her.
>
> . . . .
>
> Counsel for Cabinet: Was the bruising on her arms because [J.A.J.] was trying to escape from you?
>
> . . . .

> Mother: I would say so.... I did use a belt, which I don't usually do. I usually don't spank my kids at all. I was looking for my—it's a little the paint stick that I have that I use that the [children] had hidden from me. [The belt] was my last resort.... I had tried to use everything possible before we got to spanking.

At the March 16 hearing, however, mother again attempted to explain the "spanking" by stating that "this was actually the first time" she had spanked the children.

Mother nevertheless maintained that the children had no reason to be afraid of her. When asked if the instances of sexual abuse and bruising affected her relationship with J.A.J. in any way, mother stated "not to a point where she feels afraid of me and does not want to come home."

Mother was also questioned regarding her continued contact with J.H. after he confessed to sexually abusing J.A.J. Mother stated that "it was a long time ago and it doesn't even matter." She indicated that she wrote to him regarding "this issue with J.A.J. because I wanted to find out from him what had really happened." Mother testified that she ceased communicating with him when she did not receive a response.[7]

Regarding mother's child support obligation, she indicated that she was unaware of the amount of the arrearage. She explained that "this stuff was dropped on me ... so, if it is a felony, it is a felony that was pushed on me because I did not have any income." Mother testified that she is now receiving disability benefits in the amount of $773 per month and that her child support obligation of $100 per month, which included payment toward the ar-

---

7. The record reflects that mother did continue to receive support from J.H. after he was incarcerated. However, after some delay and the Cabinet's reporting concern regarding her continued contact with J.H., she obtained a divorce.

rears, was now being deducted from her check. This is currently mother's sole source of income. She had obtained part-time employment, but reported that she recently resigned because "[she] would like to get [her] children back and need[s] to be in the home with them."

Mother also stated that she did "not want [her] kids to be punished for a mistake that [she] ha[d] made." She felt that the children were being punished and would be punished again if they were sent to another foster home. She adamantly "refuse[d] to see [her] children punished."

At all times during the hearing, the Cabinet and the children's *guardian ad litem* maintained that it was not in the best interest of the children to return to their mother given the fact that the "spanking" incident occurred so soon after being permitted to have unsupervised visits and while remaining under the scrutiny of the Cabinet. The *guardian ad litem* indicated that J.A.J. had never stated that she wished to be returned to her mother's home. Additionally, he was concerned that mother did not have the ability to protect the children.

At the March 16 hearing, the *guardian ad litem* reported that the children were neutral as to whether they wished to return to their mother or be placed in another foster home. At that time, mother also presented a facebook message from J.A.J. in which J.A.J. stated that she wished to return to her mother's home. The circuit court also noted that it had received correspondence from J.A.J. expressing her desire to return to her mother.

Post-hearing, the *guardian ad litem* met with the children again. At that time, he reported that both children "prefer[red] to return home rather than face an uncertain placement in a new foster home." He observed that, although M.H. had always expressed a preference to return home,

J.A.J.'s desire to return home had only occurred since she was informed that the Howard's did not intend to adopt the children.

Based upon this evidence, the circuit court found that:

[The parents] had been unable to protect and preserve [the children's] fundamental right to a safe and nurturing home; [the children are] abused or neglected child[ren] as defined in KRS [Kentucky Revised Statutes] 600.020; and it is in the best interests of the child[ren] that ... parental rights be terminated.

[The parents], for a period of not less than six months, have continuously or repeatedly failed or refused to provide, or have been substantially incapable of providing, essential parental care and protection for the child, and there is no reasonable expectation of improvement in parental care and protection, considering the age of the child[ren].

[The parents], for reasons other than poverty alone, have continuously or repeatedly failed to provide or are incapable of providing essential food, clothing, shelter, medical care or education reasonably necessary and available for the child[ren]'s well-being, and there is no reasonable expectation of significant improvement in the parents' conduct in the immediately foreseeable future, considering the age of the child.

The respondent mother has allowed [J.A.J.] to be sexually abused or exploited.

The respondent putative father [J.L.J.] has abandoned [J.A.J.] for a period of more than ninety days.

The respondent father [J.H.], having been convicted of a criminal charge relating to the sexual abuse of [M.H.]'s half sibling, and that physical or sexual

abuse, neglect, or emotional injury to the child named in the present termination action is likely to occur if the parental rights are not terminated.

The child[ren] ha[ve] resided in foster care under the supervision of the Cabinet for more than fifteen of the most recent twenty-two months prior to the filing of this petition to terminate parental rights.

The Cabinet for Health and Family Services has offered or provided all reasonable services that were likely to permit reunification of this family. On August 31, 2011, the [circuit court] ordered that further reasonable efforts to provide reunification services be waived.

Termination of parental rights is in the best interest of the child[ren], and the Cabinet for Health and Family Services has facilities available to accept the care, custody and control of [the children], and is the agency best qualified to receive custody.

Accordingly, the circuit court ordered that the parental rights of mother and fathers be terminated and that the children be made wards of the state. Mother now appeals.

## II. STANDARD OF REVIEW

 We may "set aside the trial court's findings when those findings are clearly erroneous." *Vinson v. Sorrell*, 136 S.W.3d 465, 470 (Ky.2004). "To determine whether findings are clearly erroneous, reviewing courts must focus on whether those findings are supported by substantial evidence." *Id.*

"[S]ubstantial evidence" is [e]vidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence, ... has sufficient probative value to induce conviction in the minds of reasonable men.

Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court. Thus, [m]ere doubt as to the correctness of [a] finding [will] not justify [its] reversal, and appellate courts should not disturb trial court findings that are supported by substantial evidence.

*Id.* (internal quotation marks omitted). Accordingly, the standard for mother to prevail on appeal is very high.

The trial court has broad discretion in determining whether the child fits within the abused or neglected category and whether the abuse or neglect warrants termination. This Court's review in a termination of parental rights action is confined to the clearly erroneous standard in CR [Kentucky Rules of Civil Procedure] 52.01 based upon clear and convincing evidence, and the findings of the trial court will not be disturbed unless there exists no substantial evidence in the record to support its findings. Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people.

*R.C.R. v. Commonwealth Cabinet for Human Resources*, 988 S.W.2d 36, 38–39 (Ky. App.1998), *as modified* (Jan. 29, 1999) (internal quotation marks and citations omitted). "In a trial without a jury, the findings of the trial court, if supported by sufficient evidence, cannot be set aside unless they are found to be clearly erroneous. This principle recognizes that the trial

court had the opportunity to judge the witnesses' credibility." *Id.* at 39 (internal quotation marks and citations omitted).

## III. ANALYSIS

■ Pursuant to KRS 625.090, the circuit court may involuntarily terminate parental rights only if:

> based on clear and convincing evidence, a circuit court finds: (1) that the child is abused or neglected as defined in KRS 600.020(1); (2) that termination is in the child's best interests; and (3) the existence of one or more of ten specific grounds set out in KRS 625.090(2).

*M.B. v. D.W.*, 236 S.W.3d 31, 34 (Ky.App. 2007).

In the present case, mother concedes that the family court's finding that the children were abused or neglected pursuant to KRS 625.090(1) was supported by substantial evidence. Therefore, the first element of the test is met.

Mother, however, argues that the circuit court's finding that termination of her parental rights was in the best interest of the children pursuant to KRS 625.090(1)(b) was not supported by substantial evidence. When determining whether termination would be in the best interest of the child, the circuit court must consider:

> (a) Mental illness as defined by KRS 202A.011(9), or an intellectual disability as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time;
>
> (b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family;
>
> (c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court;
>
> (d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child;
>
> (e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and
>
> (f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.

KRS 625.090(3)(a–f).

In the present case, the circuit court found that termination would be in the children's best interest. Although the circuit court's findings of fact primarily recited the statutory bases for involuntary termination, mother did not request any additional findings. We cannot reverse or remand "because of the failure of the [circuit] court to make a finding of fact on an issue essential to the judgment unless such failure is brought to the attention of the [circuit] court by a written request for a finding on that issue or by a motion pursuant to Rule 52.02." CR [8] 52.04.

The testimony, nonetheless, provided ample evidence for the circuit court's evaluation of each of the factors delineated in KRS 625.090(3)(a–f). Specifically, the testimony reflects that mother suffers from

---

**8.** Kentucky Rules of Civil Procedure.

both mental and physical illness that may impair her ability to care for her children. *See* KRS 625.090(3)(a). The Cabinet also testified that substantial effort was made to reunite mother with her children over a period of years and that these services were only discontinued after the "spanking" incident. *See* KRS 625.090(3)(c). It is uncontested that mother made every effort to comply with her case plan but nevertheless failed to provide a safe environment for the children when permitted to have unsupervised visitation. *See* KRS 625.090(3)(d). A substantial amount of testimony was proffered regarding the children's performance in school, their adjustment to foster care, their emotional well-being, and their wishes regarding their future care for the circuit court to consider when making a best interest determination. *See* KRS 625.090(3)(e). It was also uncontroverted that mother failed to pay child support despite being able to obtain gainful employment. *See* KRS 625.090(3)(f). Finally, the testimony concerning the bruising inflicted by mother during the second unsupervised visit, mother's apparent lack of remorse or appreciation of the gravity of the situation, and the resulting criminal conviction clearly support the circuit court's conclusion that it was not in the best interest of the children to return to the care of their mother. *See* KRS 625.090(3)(b). Thus, we cannot conclude that the circuit court's conclusion regarding the children's best interest in light of these factors was clearly erroneous.

In addition to the above criteria, pursuant to KRS 625.090(2), parental rights may not be terminated unless the trial court finds **one** of the following grounds by clear and convincing evidence:

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection considering the age of the child;

(f) That the parent has caused or allowed the child to be sexually abused or exploited;

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child; [or]

. . . .

(j) That the child has been in foster care under the responsibility of the cabinet for fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition to terminate parental rights.

The circuit court concluded that each of the above factors was met. Mother argues that, despite having pled guilty to criminal abuse as a result of the incident, the Cabinet failed to prove that J.A.J.'s bruising from the "spanking" resulted in a serious physical injury pursuant to KRS 625.090(2)(b) or that they constituted an act of abuse or neglect pursuant to KRS 600.020(1). Likewise, she argues that the Cabinet failed to prove that there was no reasonable expectation of significant improvement in mother's conduct in the immediately foreseeable future pursuant to KRS 625.090(2)(g).

We need not address these arguments, however, because it is uncontroverted that the children have been in foster care for at least fifteen of the most recent twenty-two

months. This finding alone was a sufficient basis for termination of mother's parental rights. *See* KRS 625.090(2) (requiring a finding of **one** or more of the grounds delineated above).

Mother also contests that the Cabinet failed to provide reasonable reunification services pursuant to KRS 625.090(4). Mother appears to assert that if services had continued improvements could have been achieved which would warrant returning the children to mother. As mentioned earlier, cabinet worker Vanessa Dennis testified that a lot of time was spent attempting to reunify mother with her children. It appears that these services had been for a substantial period of time and discontinued only after the "spanking" incident. Thus, mother has failed to demonstrate how additional services would serve to protect the children from repeated occurrences of abuse.

Furthermore, we conclude that the trial court's finding that the Cabinet had provided all reasonable services was based upon substantial evidence. There was ample testimony that both mother and the children had been offered a number of services throughout the time the children were in foster care and that these services were fully utilized.

Accordingly, we affirm.

ALL CONCUR.