v.

**CABINET FOR HEALTH AND FAMILY SERVICES, Commonwealth of Kentucky; and R.A.K., (Minor Child), Appellees**

NO. 2014–CA–001350–ME

Court of Appeals of Kentucky.

RENDERED: FEBRUARY 5, 2016; 10:00 A.M.

ORDERED PUBLISHED: MARCH 25, 2016; 10:00 A.M.

Brief for Appellant: Susan B. Jones, Lexington, Kentucky.

Brief for Appellee: Jerry M. Lovitt, Lexington, Kentucky.

BEFORE: DIXON, JONES, AND NICKELL, JUDGES.

*OPINION*

JONES, JUDGE:

This appeal arises out of an order entered by the Family Division of the Fayette Circuit Court ("family court") terminating the parental rights of B.E.K. ("Mother") to her minor child, R.A.K. ("Child"). On appeal, Mother argues that the family court erred because the evidence was insufficient to establish that she abused or neglected R.A.K. Having carefully and exhaustively reviewed the rather lengthy record, we discern no error on the trial court's part. Substantial evidence exists to support the trial court's findings. Accordingly, we affirm.

## I. BACKGROUND

Mother is unmarried. In 2009, Mother had a sexual encounter with an unknown male she met at a house party in Lexington, Kentucky. Child was conceived during this encounter.[1] Mother gave birth to Child on March 20, 2010. For approximately the next year, Child remained in Mother's care. Sometime in March of 2011, Mother sent Child to live with her maternal cousin. The Cabinet for Health and Family Services, Commonwealth of Kentucky ("the Cabinet"), first became involved on March 23, 2011, when Mother was sick. When Mother presented herself at the doctor's office, she did not have Child with her and would not tell the receptionist Child's whereabouts. This alarmed the receptionist so she called the Cabinet hotline stating that she was concerned for Child's safety given Mother's mental health issues.

---

1. The identity of the natural father is not known and no person has been identified as a putative father with potential parental rights under Kentucky Revised Statutes (KRS) 625.065.

The Cabinet dispatched a social worker to Mother's home to investigate. Mother told the social worker that Child was fine, but refused to have Child brought back to Fayette County so that the Cabinet could confirm that Child was safe. This refusal prompted the Cabinet to seek an emergency custody order for Child. The order was issued, Child was removed from Mother's custody, and Child was placed in the temporary custody of a relative of Mother. After completing an investigation, Child was returned to Mother on June 8, 2011.

Less than a month later, Mother telephoned her social worker, Ms. Shannon Horn, in the middle of the night expressing that Child was inconsolable, was not eating food, would not sleep, and was eating non-food items. The calls began at midnight and continued until four that morning. During these calls, Mother expressed that the bond between her and Child was broken. She told Ms. Horn that she was going to give Child away to a woman she had located and do what she could to forget Child.

Obviously, this alarmed Ms. Horn. She conveyed the conversations she had with Mother to her supervisor. This led to the Cabinet obtaining a second emergency custody order on June 22, 2011. Thereafter, Mother refused to assist in preparing Child for her removal. She would not pack any personal items or clothing for Child, causing her to leave Mother's care without any possessions or clothing.

Child was placed in foster care. Initially, Child's permanency goal was "return to parent." A case plan was developed to assist Mother in reunification with Child. The case plan provided that Mother should maintain stable housing, maintain consistent mental health treatment, follow all recommendations of the providers, and cooperate fully with the Cabinet. As part of this plan, the Cabinet conducted supervised visits between Mother and Child. Some of the visits went well, but others did not. Specifically, there were visits where Mother would wear sunglasses and earplugs. At one visit, Mother left the building, leaving Child alone on the floor in the visitation room.

The foster parents reported that Child displayed extreme behavior following her visits with Mother. Child would engage in head-banging, which was so severe that the Child required plastic surgery due to her injuries. As concern mounted over Child's extreme behavior, Child was referred for an evaluation by Kelly Jones, a Psychological Practitioner. Ms. Jones diagnosed Child with Reactive Attachment Disorder. She further noted that Child displayed signs of being approach avoidant, had poor social interaction, and other fear-based symptoms. She recommended that Mother's visits with Child terminate.

Due to the Cabinet's concerns and Mother's refusal to discuss her mental health, the Cabinet referred Mother and Child to the University of Kentucky for a Comprehensive Assessment and Training Services ("CATS") evaluation. The CATS report detailed Mother's mental health problems, her treatment (or lack thereof), her perceptions of Child, and her past parenting of Child. The CATS report indicated that Mother had previously allowed her paranoia and mental issues to interfere with providing for Child's needs such as when she refused a referral to First Steps. The CATS report also suggested that Mother had failed to appreciate and address Child's chronic ear infections, which led to a speech delay and other associated problems. The report also discussed Child's behavioral issues as being most likely caused by Mother's inability to connect with Child and her inconsistent behavior in parenting Child. Despite Mother's efforts and progress toward

completion of her case plan, the CATS evaluation recommended that Child not be returned to Mother's care because Mother had failed to adequately address her mental health issues to minimize the risk of further emotional and physical harm to Child. Specifically, the evaluation provided:

Given the chronic nature of [Mother's] mental health symptoms, repeated failed attempts for her to independently parent (3 known attempts), her limited insight into these difficulties, limited support system, and high degree of ongoing distress noted during this assessment, reunification between the caregiver and her young child is not recommended at this time. The nature of [Mother's] difficulties suggests a poor prognosis for completely ameliorating caregiving risk and her limited support system suggests she does not have the assistance needed to promote caregiving efforts at this time.

(Report at p. 36–37).

After receiving the CATS evaluation, the Cabinet changed its permanency plan from reunification to termination and adoption. On June 22, 2012, the Cabinet filed a Petition for Involuntary Termination of Parental Rights. The family court held a lengthy hearing broken up into several different days of testimony. The hearing began on October 24, 2012, and ultimately concluded on May 19, 2014.

Throughout the course of these proceedings, an abundance of testimonial evidence was presented to the family court from several individuals. After hearing all of the evidence presented over several hearings, the family court entered a thorough order detailing its conclusion to terminate Mother's parental rights to Child. The family court made the following factual findings as part of its amended order entered August 1, 2014:

1. The child, R.A.K., a female, was born on March 20, 2010. She is committed to the custody of the Cabinet ... by order of the Fayette Family Court and has resided in foster care under the responsibility of the Cabinet since on or about June 22, 2011. She is an abused and neglected child as defined in KRS 600.020; it is in the best interests of the child that [Mother's] parental rights be terminated. The child was found to be dependent in the juvenile court proceedings below, but the evidence at trial of this action is clear and convincing that she is an abused and neglected child pursuant to the statute.

2. According to what she has described as paranoid disorder, [Mother] has struggled with mental illness throughout her adult life, and as a teenager. She suffers, or has suffered from post-traumatic stress disorder and exhibits other behavior consistent with other mental health concerns which have not been diagnosed in part because she failed to disclose some of the factors leading to these conditions.

3. [Mother] has allowed emotional injury to be inflicted upon the child by other than accidental means. She has also allowed a risk of emotional injury to be inflicted upon the child, by other than accidental means, based on the circumstantial evidence and pattern of events described in evidence, including the Child's extreme reactions to and after the Mother's visits. Kelli Jones testified to this pattern of behavior, as did the child's foster mother. While the Mother's therapist, Narda Shipp, testified that she was capable of caring for the Child, when the child was returned to her care based on Ms. Shipp's recommendation, the child's behavior showed that she was traumatized by the return to the mother's care, and the mother

herself was soon planning to give the child away. Although the child's behaviors have not ceased and she still requires therapy and special care and supervision, the evidence showed that she is making good progress both in her physical and mental health and in her social adjustment.

4. [Mother] has adopted a pattern of conduct which has rendered her incapable of caring for the Child, based upon the testimony of the witnesses at trial. The respondent herself testified that she suffers from a "paranoid disorder" and the evidence on the record supports the finding of the court that she suffers from mental illness.

5. [Mother's] therapist testified that she suffers from post-traumatic stress disorder, and that she will talk about some things but not others, so that she refuses to address the history and causes of her disorder. The Court has observed that her demeanor and behavior in these proceedings are consistent with her diagnosis of post-traumatic stress disorder. Her refusal to deal with her past, which she has stated is "not up for discussion," continues to plague her. In dealing with the Cabinet and service providers, she has exhibited behavior which is abrupt and defensive, in order to defend herself from life's challenges. She has endured considerable stress and trauma in her life, but hasn't addressed the history and causation of her mental illness.

6. [Mother's] abrupt and defensive attitude has played a role in her parenting of the child. In visits with the child, she sometimes has not interacted with the child. She has sometimes worn sunglasses and earplugs at visits. She has left the child alone in the visit room, and has exited the building. She has left scheduled visits early.

7. [Mother] has exhibited an attitude of withdrawal in her communications with the Cabinet's social workers. She has refused to discuss her mental health diagnosis. She has commented that she has told her therapist all that she needs to tell her, and that she intended to discontinue therapy.

8. [Mother] testified that she has received SSI benefits for approximately 30 years for a condition she describes as paranoid disorder. She testified that when she was incarcerated, the authorities gave her drugs against her will.

9. The testimony at trial regarding statements and attitudes of [Mother] as well as [Mother's] own testimony, show that she misinterprets events and conversations. Her misconceptions of her experiences are consistent with paranoid disorder. She misinterpreted a compliment about the child made by a staff person at the office of Dr. Castro (the child's pediatrician), concluding that the staff person wanted to take the child away from her. After the child had surgery to implant tubes in her ears, [Mother] interpreted the child's reaction upon waking up from the anesthetic, when the child reached for the social worker instead of her, concluding that the child reached for the worker because the worker's breasts were larger than her own. She once told one of the social workers that she wasn't her slave, and that the worker had to respect her.

10. [Mother's] refusal or inability to take steps to work through her trauma history (which she refuses to discuss) has caused the child emotional harm. She has shown an inability or unwillingness to address her history or serious trauma, which is the basis of her post-traumatic stress disorder.

11. [Mother] has been incapable of providing parental care and protection for

the child for a period of not less than six months. When the child was returned to her care, after only a few weeks she was calling the social worker, expressing her inability to care for the child, saying that she wanted to have her adopted. She believed that the child was not eating or sleeping due to separation and that her bond with the child had been broken. The child's challenges are severe and [Mother] was unable to deal with her on the child's return to her care.

12. [Mother] displayed great distress during the hearings held in the juvenile court proceedings. Based on all the evidence, there is no reasonable expectation of improvement in her conditions and behavior in the foreseeable future, based on her demeanor and behavior in court.

13. [Mother] loves the child and has made attempts to provide her with a safe home.

14. [Mother] has an adult child, with whom she has a very bad relationship. She has suggested that she and her son hate each other, that he is a thug, and that he needs to be killed.

15. The court considered the mental health of the [Mother,] and conditions rendering her incapable of caring for the child, as exhibited by the child's removal from her care, return to her care, and second removal when she was unable to care for the ongoing needs of the child.

16. The child has been profoundly affected by the [Mother's] parenting, which correlates with extreme behaviors after the visits resulting in behaviors such as banging her head against the floor resulting in injury, eating non-food items, being approach-avoidant in interactions with her caretaker—approaching her foster mother for comfort but then shying away. The child has had to have plastic surgery for the injuries she inflicted by her head-banging. She suffers from reactive attachment disorder, of unknown etiology, but when visits with the [Mother] stopped, her behaviors improved—circumstantial evidence that her behaviors were caused by visits with the [Mother.] The child is poorly attached to the [Mother,] who has instilled a fearful attitude in the child. On occasion, at visits, she would refuse to acknowledge her [Mother.] The child needs a secure and loving home to alleviate her fears, and she has such a home with her foster parents.

17. The Court has considered the testimony of Kelli Jones and the certified records of the University of Kentucky Center on Trauma and Children, Child and Adolescent Trauma and Training Institute (CATTI) and finds that there has been a considerable reduction in the severity of the child's extreme behaviors, as there has been a passage of time since her last visit with the [Mother.] While there are still some troublesome behaviors that persist, it is noteworthy that the treatment progress note of March 7, 2014, indicates that there has been a significant decrease in head-banging, lower intensity of emotional outburst with shorter duration and increased ability to accept help from the foster parents, better ability to articulate what she needs and increased awareness of and increased desire to earn rewards, decreased physical aggression and the use of relaxation breathing guided by the foster parents when she is upset. The extreme nature of the symptoms presented is such that a lengthy period of time has been required for the resolution of these problems without concern of further visits that the child might have with her [Mother].

18. The Cabinet has made reasonable efforts to reunite the family. The court encouraged and demanded that the Cabinet make these efforts. Despite reasonable efforts by the Cabinet, [Mother] has been unable to care for the child, so that the [Mother's] visits with the child had to be ceased, due to the child's reactions to visits.

19. [Mother] has made efforts to change, but still hasn't been willing to address her history of trauma through therapy.

20. The emotional and mental health of the child has greatly improved so that she has overcome her reactive attachment disorder, forming a secure bond with her foster parents. She has also overcome most of her developmental delays, except in social development. The First Steps program worked with the child and her foster parents, so that her tantrums have diminished. She is also making good progress in her pre-school. Since visits with her mother have stopped, she has made advanced improvements and progress in her conditions. Further visits with her [Mother] would be detrimental to her progress.

21. [Mother] has paid child support, in an effort to support the child and to demonstrate improvement. Accrual of her child support obligation shall cease.

Based on its findings of fact, the family court made the following conclusions of law:

1. R.A.K. is an abused or neglected child as defined in KRS 600.020(1).

2. Termination of parental rights would be in the best interest of the child.

3. Respondent parent has continuously or repeatedly inflicted or allowed to be inflicted emotional injury upon the child, by other than accidental means.

4. Respondent parent, for a period of not less than six months, has continuously been substantially incapable of providing essential parental care and protection for the child and there is no reasonable expectation of improvement in parental care and protection, considering the age of the child.

5. Respondent parent, for reasons other than poverty alone, has failed to provide, or has been incapable of providing essential food, clothing, shelter, medical care, or education necessary and available for the child's well being, and there is no reasonable expectation of significant improvement in the immediately-foreseeable future, considering the age of the child.

6. Respondent parent suffers from a mental illness which has rendered her consistently unable to care for the immediate and ongoing physical and psychological needs of the child for extended periods of time.

7. The Cabinet has made reasonable efforts to reunite the child with the parent, prior to filing its petition in this action.

8. The parent has made efforts and adjustments to make it in the child's best interest to be returned to her care, but these efforts and adjustments have been insufficient.

9. The child's physical, emotional and mental health have improved since removal from the parent's care and the prospects for continued improvement of child's welfare are good, if termination is ordered.

10. The parent has paid a reasonable portion of the substitute care of the child.

11. The provision of additional services to the parent would not be likely to bring about lasting parental adjustment enabling a return of the child to the parent.

Based on the family court's findings and conclusions, it entered an order terminating Mother's parental rights. This appeal followed.

## II. STANDARD OF REVIEW

The family court has wide discretion in terminating parental rights. *Com., Cabinet for Health and Family Services v. T.N.H.*, 302 S.W.3d 658, 663 (Ky.2010) (citing *K.R.L. v. P.A.C.*, 210 S.W.3d 183, 187 (Ky.App.2006)). Appellate "review is limited to a clearly erroneous standard which focuses on whether the family court's order of termination was based on clear and convincing evidence." *Cabinet for Health & Family Servs. v. K.H.*, 423 S.W.3d 204, 211 (Ky.2014). "Pursuant to this standard, an appellate court is obligated to give a great deal of deference to the family court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them." *Id.*

"Substantial evidence has been conclusively defined by Kentucky courts as that which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person." *Bowling v. Natural Res. & Envtl. Prot. Cabinet*, 891 S.W.2d 406, 409 (Ky.App.1994).

## III. ANALYSIS

The General Assembly provided the mechanism for the involuntary termination of parental rights in KRS 625.090. Termination of a party's parental rights is proper upon satisfaction, by clear and convincing evidence, of a three-part test. First, the child must have been found to be an "abused or neglected" child, as defined by KRS 600.020. KRS 625.090(1)(a). Second, termination must be in the child's best interest. KRS 625.090(1)(b). Third, the family court must find at least one ground of parental unfitness. KRS 625.090(2). Mother argues that the Cabinet did not meet its burden under the termination statute.

### A. KRS 625.090(a)

The first requirement necessary to terminate a parent's rights is set forth in KRS 625.090(a). It provides that the family court must find at least one of the following three requirements to be present by clear and convincing evidence:

(a) 1. The child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), by a court of competent jurisdiction;

2. The child is found to be an abused or neglected child, as defined in KRS 600.020(1), by the Circuit Court in this proceeding; or

3. The parent has been convicted of a criminal charge relating to the physical or sexual abuse or neglect of any child and that physical or sexual abuse, neglect, or emotional injury to the child named in the present termination action is likely to occur if the parental rights are not terminated[.]

KRS 625.090(a)(1)–(3).

Only subsection 2 is applicable to this appeal. Under KRS 600.020(1) an "abused or neglected child" means a child whose health or welfare is harmed or threatened with harm when:

(a) His or her parent, guardian, person in a position of authority or special trust, as defined in KRS 532.045, or other person exercising custodial control or supervision of the child:

1. Inflicts or allows to be inflicted upon the child physical or emotional injury as defined in this section by other than accidental means; ·

2. Creates or allows to be created a risk of physical or emotional injury as defined in this section to the child by other than accidental means;

3. Engages in a pattern of conduct that renders the parent incapable of caring for the immediate and ongoing needs of the child including, but not limited to, parental incapacity due to alcohol and other drug abuse as defined in KRS 222.005;

4. Continuously or repeatedly fails or refuses to provide essential parental care and protection for the child, considering the age of the child;

5. Commits or allows to be committed an act of sexual abuse, sexual exploitation, or prostitution upon the child;

6. Creates or allows to be created a risk that an act of sexual abuse, sexual exploitation, or prostitution will be committed upon the child;

7. Abandons or exploits the child;

8. Does not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being. A parent or other person exercising custodial control or supervision of the child legitimately practicing the person's religious beliefs shall not be considered a negligent parent solely because of failure to provide specified medical treatment for a child for that reason alone. This exception shall not preclude a court from ordering necessary medical services for a child;

9. Fails to make sufficient progress toward identified goals as set forth in the court-approved case plan to allow for the safe return of the child to the parent that results in the child remaining committed to the cabinet and remaining in foster care for fifteen (15) of the most recent twenty-two (22) months; or

(b) A person twenty-one (21) years of age or older commits or allows to be committed an act of sexual abuse, sexual exploitation, or prostitution upon a child less than sixteen (16) years of age[.]

Mother claims that there was no clear and convincing evidence of neglect or abuse as defined in KRS 600.020(1) and thus the termination of her parental rights should be reversed. We disagree.

■ Here, the family court found the Child to be neglected in the termination proceeding itself, and specifically set forth in numerical paragraphs 5 through 21 in its Amended Findings of Fact the exact factual evidence on which it based its conclusion, as well as verbally stating its reasons on the record. The family court specifically found that Mother had allowed emotional injury to be inflicted upon Child and had also allowed a risk of emotional injury to be inflicted based upon the circumstantial evidence presented. *See* KRS 600.020(1)(a)1–2.

While Mother may disagree with the evidence presented by the Cabinet or attach a different significance to it, we cannot conclude that the family court's finding of emotional injury was devoid of all factual support. At the trial, Kelly Jones offered testimony that Child suffered from Reactive Attachment Disorder, which caused her to lash out and display other inappropriate behavior. Ms. Jones opined that Child's symptoms were rooted in fear due to Mother's failure to provide Child with a safe and nurturing environment. Mother's behavior during her supervised

visits with Child added credence to Ms. Jones's assessment and opinions. Mother was observed wearing earplugs and sunglasses while interacting with Child as well as abruptly cutting off visitation, leaving Child sitting on the floor alone. Child's disturbing behavior was also documented to correlate with visitation and improved when visitation with Mother ceased.

Next, the family court found that Mother had adopted a pattern of conduct which had rendered her incapable of caring for Child. KRS 600.020(1)(a)3. It is undisputed that Mother suffers from extensive and long-standing mental health issues. Mother refused to cooperate with the Cabinet in discussing her mental health issues and working to formulate a treatment plan to minimize the likelihood of relapse. There was sufficient evidence in the record from which the family court could have inferred that Mother's mental health issues interfered with her ability to adequately care for Child. She refused a First Step referral, which Child needed; she misinterpreted Child's fussiness as an indication of a broken parental bond; she indicated that she was going to give Child away; and she refused to cooperate with medical and Cabinet personnel who simply wanted to confirm Child's safety.

Lastly, the family court found that Mother had been incapable of providing parental care and protection for Child. *See* KRS 600.020(1)(a)4. The court emphasized when Child was returned to Mother's care, after only a few weeks, Mother was calling the social worker and expressed her inability to care for Child and plans to give Child away. There was also evidence presented that when Child was taken away from Mother she had speech difficulties possibly caused by unaddressed, chronic ear infections.

In sum, we have reviewed the abundance of evidence and testimony. In so doing, it is clear to us that the family court carefully considered and evaluated all the evidence. That evidence supports the family court's determination that Child was an abused or neglected Child.

## B. KRS 625.090(2)

Next, we turn to the family court's determination with respect to the factors set out in KRS 625.090(2). KRS 625.090(2) provides that at least one or more of the various grounds listed in KRS 625.090(2)(a-j) must also be proven by clear and convincing evidence before a termination of parental rights may be ordered. The grounds listed in the statute are:

(a) That the parent has abandoned the child for a period of not less than ninety (90) days;

(b) That the parent has inflicted or allowed to be inflicted upon the child, by other than accidental means, serious physical injury;

(c) That the parent has continuously or repeatedly inflicted or allowed to be inflicted upon the child, by other than accidental means, physical injury or emotional harm;

(d) That the parent has been convicted of a felony that involved the infliction of serious physical injury to any child;

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;

(f) That the parent has caused or allowed the child to be sexually abused or exploited;

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child;

(h) That:

1. The parent's parental rights to another child have been involuntarily terminated;

2. The child named in the present termination action was born subsequent to or during the pendency of the previous termination; and

3. The conditions or factors which were the basis for the previous termination finding have not been corrected;

(i) That the parent has been convicted in a criminal proceeding of having caused or contributed to the death of another child as a result of physical or sexual abuse or neglect; or

(j) That the child has been in foster care under the responsibility of the cabinet for fifteen (15) of the most recent twenty-two (22) months preceding the filing of the petition to terminate parental rights.

KRS 625.090.

■ In the present case, the family court determined that grounds existed under KRS 625.090(2)(c),(e) and (g). The Cabinet asserts that the family court's very detailed findings of fact certainly support the conclusions of law that Mother inflicted emotional injury on the child, failed to adequately provide parental care and supervision, and also failed to provide essentials of life for Child's overall well-being. Thus, the Cabinet argues that the required elements of KRS 625.090(2)(c),(e), and (g) were all met and supported by substantial evidence. We agree.

As already noted, there was substantial evidence of Mother having inflicted emotional injury on Child. KRS 625.090(2)(c). Likewise, with regard to KRS 625.090(2)(e), the family court found that Mother had been incapable of providing parental care and protection for the child for a period of not less than six months. When the Child was returned to Mother's care for just a few weeks, Mother called the social worker and expressed her inability to care for Child, stating she had found a woman and was going to give Child to her. Child has remained under the Cabinet's care since June of 2011, a period much longer than six months. While Mother paid child support and generally appears financially capable of meeting Child's physical needs, it is Child's emotional needs and day-to-day care that are most problematic. As previously noted, during visitations, Mother was unable to offer consistent emotional availability. While Mother no doubt has the sincere desire to properly parent Child, her mental health problems prevent her from doing so. And, unfortunately, Mother's refusal to discuss the nature and extent of her problems with her therapists and the Cabinet poses an insurmountable obstacle for her.

With regard to KRS 625.090(2)(g), the foster Mother testified to the various services that the Child received with First Steps and the emotional, cognitive, and behavioral success Child achieved through the program. When Child was in Mother's care, Mother refused a First Step referral. Ms. Mary Lindon, a social worker, testified that Mother was generally unable to calm Child down if she had a tantrum or exhibited head-banging behav-

ior. Ms. Lindon testified that the foster mother had learned how to calm Child. Again, this history is indicative of Mother's inability to act in Child's best interest.

While the family court found the presence of three factors, one would have been sufficient to justify termination. Nevertheless, as detailed above, we conclude that substantial evidence supported the family court's conclusion with respect to all three factors.

### C. KRS 625.090(3) Best Interest

Lastly, under KRS 625.090(3), the family court must consider whether termination is in the best interests of the child. The family court has very broad discretion when making this determination. *W.A. v. Cabinet for Health and Family Services, Com.,* 275 S.W.3d 214 (Ky.App.2008). In determining the best interests of a child, KRS 625.090(3) requires the court to consider several factors which include the following:

(a) Mental illness as defined by KRS 202A.011(9), or an intellectual disability as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time;

(b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family;

(c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court;

(d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child;

(e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and

(f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.

■ First, there was no factual dispute that Mother suffers from some form of mental illness, although there was conflicting testimony offered as to the specific type and degree of severity of her symptoms. Aimee Mau, a qualified mental health professional from the CATS clinic, testified that Mother's level of mental distress was consistent with psychiatric inpatients receiving around the clock care, and because of Mother's fragile mental state, the CATS clinic could not recommend reunification of the Mother with the Child. This was a major consideration in the family court's decision to terminate parental rights, and is reflected in the detailed findings of fact and conclusions of law.

Next, the Cabinet must make reasonable efforts to reunite the child with the parent prior to filing a petition for involuntary termination of parental rights. *See* KRS 625.090(3)(c). Mother worked with the Cabinet for over a year. Reunification was the Cabinet's initial preference. However, Mother was either unable or unwilling to address her mental health issues on her own. She refused to explore those issues, provide documentation of medication compliance, and failed to make any real progress in her mental state. The

Cabinet changed the goal to termination only after the CATS evaluation, which was occasioned by Mother's failure to discuss or share her mental health history and treatment with the Cabinet. We believe the evidence is clear that the Cabinet attempted to reunite Mother and Child and provided Mother with a sufficient amount of time to achieve reunification before it filed for termination.

Lastly, KRS 625.090(3)(e) requires the court to consider "[t]he physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered." The Cabinet argues that proof was overwhelming with respect to this critical issue. We wholeheartedly agree. The ongoing case workers for the family, Mary Lindon and Katie McMahon, both testified that Child made enormous strides since being placed in her foster-to-adopt home, and she has shown remarkable improvements in her physical, behavioral, and mental functioning. Several witnesses testified that Child was bonded to her foster family and would only continue to improve if she remained in their care. Conversely, there was substantial evidence from the evaluators, especially Ms. Jones, that further contact with Mother, even limited visitation, would be detrimental to Child. In sum, we believe the trial court properly exercised its substantial discretion in determining that termination was in Child's best interests. *D.G.R. v. Com., Cabinet for Health & Family Servs.*, 364 S.W.3d 106, 112 (Ky.2012) ("[T]he trial court has substantial discretion in determining the best interests of the child under KRS 625.090(1)(b) and (3).").

## IV. CONCLUSION

For these reasons, we AFFIRM the order of the Fayette Circuit Court.

ALL CONCUR.