RENDERED: NOVEMBER 22, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0660-ME

T.R.C.                                                                      APPELLANT

v.
APPEAL FROM MARTIN CIRCUIT COURT
HONORABLE ADAM O'BRYAN, JUDGE
ACTION NO. 23-AD-00001

J.T.M.; CABINET FOR HEALTH
AND FAMILY SERVICES;
A.E.J., A MINOR; AND R.J.M.                                 APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ECKERLE, L. JONES, AND KAREM, JUDGES.

KAREM, JUDGE: This appeal is taken from the Martin Family Court's findings of fact, conclusions of law, order and judgment terminating the parental rights of the appellant to his son and granting the adoption petition brought by the husband of the child's mother. Upon careful review, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

The appellant, T.R.C. ("Father") had a child ("Son") with R.J.M. ("Mother") in 2012. Father and Mother were not married, and they became estranged shortly before Son was born. Father saw the baby only once. Shortly after the birth, Father left the state to pursue a job opportunity. After serving in the military, he received a medical discharge and entered the construction industry. He is currently employed as a foreman and earns over $90,000 per year. He also receives a monthly benefit of $1900 from the VA. Father has resided outside Kentucky throughout Son's life, and he currently lives in Gainesville, Georgia. He is married with two children and has purchased a larger home in anticipation of being reunited with Son.

Son has resided with Mother for his entire life. In 2017, Mother met J.T.M. ("Husband"). They began living together in 2018 and eventually married. Husband has taken a paternal role in Son's life and Son has called him "Dad" for several years. Mother and Husband both have stable, well-paid employment.

After he and Mother broke up during her pregnancy, Father made several unsuccessful attempts to establish a future relationship with Son by contacting Mother via Facebook Messenger. He wanted to attend her medical appointments and he offered to provide insurance coverage for Son and to purchase baby supplies. Mother did not want any contact. Father sent her a

message stating he would "go to the welfare office" and request a DNA test, not because he did not think he was the child's father but to "gain some rights" to the baby. He did not follow through.

Father's sister also tried to contact Mother for assurances that she and Father would be allowed to have a relationship with Son. Mother blocked both Father and his sister and told Father that he would have to go through the court system if he wished to see Son. Father messaged Mother's brother, who agreed to communicate with him and sent Father some pictures of Son, but he ended contact with Father in 2016.

On October 22, 2022, Father filed a petition to establish paternity and custody. At that point, he had not seen Son for over ten years. Pursuant to an agreed order, the parties underwent paternity testing which confirmed Father was Son's biological parent. On February 17, 2023, Husband filed a petition for adoption and involuntary termination of parental rights, alleging that Father had abandoned and/or neglected Son. Father responded with a request for joint custody and timesharing with Mother. The family court held an evidentiary hearing with testimony from Father, Father's sister, Mother, and Husband. The family court also interviewed Son in chambers. The court thereafter entered findings of fact, conclusions of law, order, and judgment, terminating Father's parental rights and

granting Husband's adoption petition. This appeal by Father followed. Further pertinent facts will be set forth below.

## STANDARD OF REVIEW

"An adoption without the consent of a living biological parent is, in effect, a proceeding to terminate that parent's parental rights." *C.J. v. M.S.*, 572 S.W.3d 492, 496 (Ky. App. 2019) (quoting *B.L. v. J.S.*, 434 S.W.3d 61, 65 (Ky. App. 2014)). "Accordingly, in adoption without consent cases we apply the same standard of review that governs parental termination cases." *Id*. "An appellate court will only reverse a trial court's decision to terminate a parent's rights if such decision is clearly erroneous, meaning there is no substantial, clear, and convincing evidence to support the decision." *P.S. v. Cabinet for Health and Family Services*, 596 S.W.3d 110, 115 (Ky. App. 2020); Kentucky Rules of Civil Procedure (CR) 52.01. "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 117 (Ky. App. 1998) (quoting *Rowland v. Holt*, 253 Ky. 718, 70 S.W.2d 5, 9 (1934)). Therefore, we will only disturb the circuit court's findings if no substantial evidence exists in the record to support its findings. *V.S. v. Commonwealth, Cabinet for Human Resources*, 706 S.W.2d 420, 424 (Ky. App. 1986) (citation omitted).

# ANALYSIS

A petition seeking adoption of a child against the wishes of the child's biological parent "is governed in its entirety by [Kentucky Revised Statutes] KRS Chapter 199." *R.M. v. R.B.*, 281 S.W.3d 293, 297 (Ky. App. 2009). KRS 199.502(1) provides that "an adoption may be granted without the consent of the biological living parents of a child if it is pleaded and proved" that any of ten possible conditions exist with respect to the child. Here, the family court relied on two of the statutory conditions to support its grant of adoption: "That the parent has abandoned the child for a period of not less than ninety (90) days[,]" KRS 199.502(1)(a), and "[t]hat the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child, and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child[.]" KRS 199.502(1)(e).

Father argues that the family court erred in finding that he abandoned Son. "For the purposes of Chapter 199, 'abandonment is demonstrated by facts or circumstances that evince a settled purpose to forego all parental duties and relinquish all parental claims to the child.'" *R.P., Jr. v. T.A.C.*, 469 S.W.3d 425, 427 (Ky. App. 2015) (quoting *O.S. v. C.F.*, 655 S.W.2d 32, 34 (Ky. App. 1983)).

Father argues that the evidence did not demonstrate a settled purpose on his part to abandon Son. He claims he was unsure that he was the biological parent and that he exhausted every avenue of communication with Mother and her family members. Father argues that his inaction was not due to intentional or voluntary relinquishment of his parental responsibilities but was due instead to being repeatedly misled about his paternity.

He compares his situation with that of the appellant in *J.A.T. v. Cabinet for Health and Family Services*, No. 2014-CA-000969-ME, 2014 WL 7339021 (Ky. App. Dec. 24, 2014). When J.A.T. learned he could possibly be the father of a child, he immediately went to the county attorney's office twice to attempt to take a paternity test. He was told another man was named on the birth certificate, however, and that there was nothing further he could do. About five months later, the child's mother named him as the putative father, and he was ordered by the county attorney to take a paternity test. As soon as his paternity was confirmed, he began taking the necessary steps to assert his parental rights. The Court held that these facts were insufficient to support a finding that J.A.T. had abandoned his child and it reversed the family court's termination of his parental rights. *Id.* at *4.

Father argues that he repeatedly reached out to Mother and her family members to no avail and that he was repeatedly misled about Son's paternity.

Father alleges that Mother and her family sent him a "clear message" that he was not Son's father and that the "actual father" had already stepped up. He contends that these affirmative misrepresentations, coupled with the fact that he was not named on Son's birth certificate, cast significant doubt on his legal relation to Son.

The evidence confirms Father did reach out repeatedly to Mother and her family members via Facebook. In one of these messages, he was told by Mother's brother that he was not Son's biological father, but there is little other evidence that he was repeatedly misled about his paternity. Furthermore, after the initially hostile exchange with Mother's brother regarding Son's paternity, their exchanges became amicable and Father's messages to the brother continued to state that he wished to see his son.

Furthermore, unlike J.A.T., who upon learning he might be the child's father immediately took action, the evidence showed Father knew he was Son's parent from the time Mother became pregnant. Mother testified that Father was present when she found out she was pregnant and that he was excited. Father nonetheless took no affirmative steps to establish paternity or assert his parental rights beyond the Facebook messages to Mother and her family, which he stopped sending in 2016. Mother informed him that he would have to take legal action to have a relationship with Son, but he made no attempt to do so, even though there was no evidence of financial or other barriers to prevent him from acting. The

facts are thus clearly distinguishable from those in *S.J. v. Cabinet for Health and Family Services*, 604 S.W.3d 294 (Ky. App. 2020), another case cited by Father. S.J.'s children had been taken into custody by the Cabinet for Health and Family Services while she was incarcerated. She had neither the knowledge nor the ability to communicate with the Cabinet. Eventually the Cabinet did reach out to S.J. and she wrote letters to her children, but the Cabinet nonetheless decided not to facilitate contact. The Court held that this constituted insufficient evidence to show abandonment by Mother. *Id.* at 300.

But, substantial evidence in the form of numerous Facebook messages showed that Father was virtually certain he was Son's biological parent. Even though Mother and her family rebuffed his messages, he made no attempt to use legal channels to gain access to Son. The evidence shows Father is an intelligent, financially-secure individual who was capable of seeking legal redress and did not suffer from the disadvantages and obstacles experienced by S.J. The standard of clear and convincing evidence does not mean uncontradicted evidence. *R.P., Jr. v. T.A.C.*, 469 S.W.3d 425, 427-28 (Ky. App. 2015) (citing *W.A. v. Cabinet for Health and Family Services*, 275 S.W.3d 214, 220 (Ky. App. 2008)). Although Mother and her family may have suggested he was not Son's father, substantial evidence shows he did know it was highly likely that he was Son's father, but only chose to institute legal proceedings in 2022 when Son was ten years of age.

The family court's finding that Father abandoned Son is supported by substantial evidence in the record and will not be disturbed on appeal.

Next, Father contends the court improperly conflated the role of the guardian *ad litem* ("GAL") with that of a friend of the court ("FOC"). At the outset of the proceedings, the court appointed a GAL who filed an initial report stating he had reviewed the case file, was familiar with the court record, and had met with Husband and Mother. The report states that the GAL was confident that Husband was of good moral character and that the adoption by Husband would be in the best interests of Son.

Father filed a motion to strike the report, arguing that the GAL was improperly acting as an FOC by submitting a report and making recommendations. Father's attorney renewed these arguments before the court at a pretrial conference. The GAL was present and stated that he was prepared to attend the final hearing and to modify his recommendations. Father's counsel argued that the GAL's report could become evidence that might result in his client losing his parental rights. Mother's counsel argued that the report was simply a recommendation that could be changed at any time and that the GAL was advocating for what he believed was best for his client, Son. The court denied Father's motion to strike the report.

At the final hearing, the GAL was present and questioned Father and Mother. He asked Father if, when he saw Son as an infant, he had reason to doubt that he was his child. Father replied "No." The GAL asked Father's age at that time, and Father replied that he was twenty or twenty-one. The GAL asked him if he was aware of the pregnancy at the time. Father testified that he was aware that Mother was pregnant, that they broke up during the pregnancy and that he had no reason to believe he was not the father. The GAL then questioned him about his employment history, his salary, and his children. Finally, he asked him what he envisioned timesharing to be. Father acknowledged it would be difficult to structure timesharing because he lives far away but testified that he would defer to the court.

The GAL asked Mother about Son's age when he first started asking about his father and she testified that it was before he was five years of age. He was five when Husband first came into her life.

The GAL thereafter submitted a second report to the court in which he summarized the evidence presented at the hearing and changed his recommendation. The report states:

> Without question [Father] has not, to date, supported his child. In his defense, he was not identified on the birth certificate and he was not 100% sure until the paternity testing results were received. However, it appears there was no indication the child was not his, biologically. The evidence is uncontroverted that he could financially

support the child in the future. Considering the factors set forth in KRS 625.090, and the mandate that the evidence must be clear and convincing, KRS 625.090(2)(a) and (e) may potentially apply. However, it seems grossly unfair to apply those to Respondent when paternity was unclear and, especially when [Father] was not on the birth certificate.

The GAL acknowledged that in the course of the *in camera* interview, Son stated he did not want to have a relationship with Father because he had not had one so far. The GAL stated that he appreciated Son's position and believed it was a natural result of not ever having been introduced to Father.

The GAL concluded that he could not recommend termination under the circumstances and recommended that Father and Son be permitted to get to know each other gradually. He acknowledged the difficulty presented by the distance between the parties and recommended that Father be required to show an extraordinary level of commitment by traveling to visit Son in Kentucky on a consistent and gradually increased basis. He also recommended that Father begin paying child support.

Father filed a response to the GAL's second report, stating that he had no objections, agreed with a graduated approach to timesharing, and was willing to travel to Kentucky for the initial stages with the hope that Son could visit him in Georgia in the future. Husband filed a lengthy response objecting to the report and

requesting the Court not to adopt it. Father filed a sur-reply urging the court to adopt the report in full.

The circuit court entered an order approving the GAL's motion for attorney fees and directed the amount of the fees to be equally divided between Father and Husband. The court crossed out a line in the order which stated, "the report of the . . . GAL is hereby accepted."

The Kentucky Supreme Court has emphasized that the GAL and the FOC play distinct, separate roles in family court proceedings and should not be confused with each other. *Morgan v. Getter*, 441 S.W.3d 94, 119 (Ky. 2014). The FOC "investigates, reports, and makes custodial recommendations on behalf of the court, and is subject to cross-examination[.]" *Id*. The GAL, on the other hand, "is a lawyer for the child, counseling the child and representing him or her in the course of proceedings by, among other things, engaging in discovery, in motion practice, and in presentation of the case at the final hearing." *Id*. Importantly, the GAL "neither testifies (by filing a report or otherwise) nor is subject to cross-examination." *Id*. The Kentucky Supreme Court has cautioned that commingling these two roles may violate the due process rights of the parties if, for instance, the GAL investigates and reports as though he were an FOC but is shielded as a GAL from cross-examination. *Id*.

Father argues that he was deprived of due process when the court allowed the GAL to assume the duties of an FOC, claiming the court created an inherent and irreconcilable conflict of interest. He further claims that by dismissing the GAL's second report without articulating any justification for its exclusion, it is not clear whether the court even considered the GAL's report in making its final determination.

We agree with Father that the circuit court improperly permitted the GAL to perform the tasks of an FOC in the proceedings. The GAL investigated, submitted reports, and made custodial recommendations, tasks exclusively within the purview of the FOC. But Father has failed to articulate any specific violation of his due process rights that resulted from the GAL's activities. Understandably, Father dropped his initial objection to the GAL's actions after the submission of the second report which was highly favorable to Father. The crossing-out of the line on the court order indicates that the court chose not to adopt the report, a decision fully within its discretion. Weighing the evidence is a task within the "exclusive province of the trial court." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). In any event, Father did not seek any further clarification from the court regarding its treatment of the report. In light of the substantial evidence in the record supporting the court's decision to grant Husband's petition and the lack of specific allegations or evidence that Father's due process rights were violated by

the GAL's activities, we conclude that the trial court's failure to properly delineate the GAL's responsibilities was harmless error in this case. *See* Kentucky Rules of Civil Procedure (CR) 61.01.

## **CONCLUSION**

For the foregoing reasons, the findings of fact, conclusions of law, order, and judgment terminating Father's parental rights and granting Husband's adoption petition is affirmed.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEES R.J.M. AND J.T.M.: |
|---|---|
| H. David Hicks | |
| Prestonsburg, Kentucky | Jaryd H. Crum |
| | Paintsville, Kentucky |